Case number 243676, Elaine Grissom et al. v. Antero Resources Corporation. Argument not to exceed 15 minutes per side. Mr. Donovan, you may proceed for the appellate. Good morning. My name is Dan Donovan. I represent Antero, and I'd like to reserve three minutes for rebuttal, please. Thank you. May it please the Court. The District Court's judgment here should be reversed because it erred when it interpreted the term marketable form to mean marketed form in the Grissom lease. That's not what this lease says, and it's not a plain language interpretation consistent with the Ohio Supreme Court's Lutz decision. What's more is the District Court's reading would make a portion of this lease meaningless because nine of the 10 specifically identified costs in the MEC clause would never be deductible under its interpretation. That reading fundamentally changes the bargain, and it skews the win-win incentive the market enhancement clause was supposed to create. I submit it can't be squared with this Court's Zentbauer decision. In Zentbauer just two years ago, this Court explained under Ohio law that, quote, a marketable product is one that is capable of being marketed. It is not a finished product, end quote. That same interpretation should have What's the market for Y-grade? I mean, it's not on the futures thing. There's no Y-grade. So obviously there has to be something that has to happen to make these individual gases marketable. What's your theory as to why the Y-grade is marketable? Sure. It's actually, Judge, marketable right at the wellhead, and there's purchasers such as Mark West that buy it. We have in the record that they're actually purchasers of that. It then moves downstream, and you can then process it into the dry gas that heats our homes. But doesn't that argue too much because that makes everything in at the wellhead contract? It doesn't, and I have that in the plaintiff's brief. Here's why it doesn't. This lease provides specific language about what is, it has to be both marketable, and then to take the cost, you also need to enhance. And to make it marketable, you have to look at what is the quality of the gas. Some gas has hydrogen sulfide in it. It's not marketable at the wellhead, period. It's not marketable. You've got to move it downstream and treat it. It might have other impurities in it, and that's why it is a factual inquiry whether or not, where the gas is marketable. It may be marketable at the wellhead. It may not be. It may be marketable right before it enters the processing plant. It might not be. It is a factual inquiry, and the flaw here is the district judge said, it must mean a finished product. That runs into Zentbauer. Why? I mean, maybe there's some ambiguity here, but the word transform is the other word in that it does seem like there's transforming going on at the second and third, well, all three stages, but it's definitely the second and third. Well, the first step, Josh, is again, this test is first, there's a two-part test. Is it marketable? And then did that cost enhance? Because remember, even if Antero spends the money- I'm asking about the word transform. Oh, sure. Okay. So I'm making the point that when it comes out, it's got water and sand, which is at least not part of this. And then you paid for the transportation. Everyone agreed that was okay. And then at stage two and stage three, there is a transformation going on. So I'm happy to go back to the ambiguity created by the tension between marketable and transform, which I appreciate. I also appreciate it's superfluous to have all these such costs that don't seem to apply. I get it. But if we start with transform, isn't it pretty fair to say there was transforming going on at the second and third stage? I don't believe so, Josh. There was enhancement, if I could explain. So the clause in the plaintiff's- the oil, gas, and other products in this lease is used several times. It's used in paragraph one, which is the granting of the lease. Oil, gas, liquid, and other gaseous hydrocarbons and their constituents and byproducts. We then look at paragraph four. It again says oil, gas, other liquid, and gaseous hydrocarbons produced through a wellboard. That's what the lessor of leases is, the minerals. Then we look at section 10B, which is- has to work with the market enhancement clause. 10B is the actual gas royalty. All gas and other hydrocarbons and byproducts. You have to read oil, gas, and other products all inclusively. It all comes out of the ground. You have to read it- they're trying to parse it to say each one is a separate product. Don't you guys label them separately in your royalty payments? There's gas and there's oil and the- is it the PPROD? Sure, there's NGL. Sure. We code everything so the royalty owner sees it, Judge. The whole focus, and this is historically true, this was true in Sugar, the Professor of Low Arbitration. You look at this and the oil, gas, and other is in there because historically what royalty owners don't want is for a oil company or a gas company to say it's neither fish nor fowl. That's not oil, gas. I'm going to call it something else, other. Because if you look, Judge, 10A and 10B, we only have an obligation to pay royalty on either oil or gas. There's no obligation to pay on something other. And that's where they really- Why isn't the fact that products is plural? I mean, why isn't that meaningful? That suggests that it can be divided up into these different methane, gasoline, whatever. But the definition, Judge, does that. They sweep it up. If you look at oil and gas, it says oil and gas means oil, gas, and other liquid and gaseous hydrocarbons. The lease under this court's Easton case, when you read it in context, it repeatedly includes everything. Any hydrocarbons, if we take a step back, what the royalty owners want is any hydrocarbons that come out of the ground, that's what they're leasing, they're entitled to get paid on. And the first question is, when is that first stream that comes out marketable? The plaintiffs argue, and the Judge adopted, that it has to be the final product. And I would submit that's not a fair reading because it consistently says oil, gas, and other products. When do you think it's marketable? This gas, in this case, I think it's relatively undisputed, is it's saleable right off the wellhead after it gets separated and treated on the well pad. Is there anyone other than Mark West, your, I guess, joint venture partner that's there, you know, buying it? Yes. In the record, Ms. Adair has Eclipse Resources, Gulfport Energy. The reason why... They're buying it at the wellhead? They're selling it at the wellhead, and there's other buyers at the wellhead. Yes, it's in the record. That's our expert, and it's undisputed. I don't think Mr. Barrett... From your wellhead, they're selling it and buying it to other people? I'm sorry, Judge? From your wellhead. Not from our wellhead, because we set it up, because it benefits us. The whole point of moving it downstream to get a higher price, which we share and benefited, the MEC worked here. $32 million more than if we would have sold it at the wellhead. That's undisputed. So is your theory, then, that if there's somebody else who would buy your product at the wellhead, then everything is marketable from the get-go? So that gas, yes, that gas would be marketable. But remember the second step, which is really the safety valve. We have to show that we enhance the value. We have to make them more money. If it costs us more, we can't take the deduction. That's what I think the big thing that... Why do you agree you have to pay for transportation from the wellhead to the second stage? Well, we don't. It was... It's marketable at the wellhead, you said. There's other people doing this. And my understanding is you're not deducting the transportation cost from wellhead to the second stage. That is true. So isn't that inconsistent? It's not. And in fact, most other companies do. And the reason why we don't is when it was originally set up, the company that does it is an affiliate. It's Antero Midstream. And Antero made the business judgment, we're not going to take the deduction, because sometimes plaintiffs sue if you charge for an affiliate. But Gulfport Energy, which is also in the report, they take that deduction. Which is the Shugart arbitration from Professor John Lowe. There he looked at what you asked about judgment, what's the evidence that it's marketable? We are not submitting it's always marketable. You have to look at the quality. Have there been historical sales in the area? And then importantly, you have to come back and say, did you enhance? Did you make them more money? Because that's the win-win incentive. Do you agree then that there would be a jury trial issue as to whether and when the product was marketable in this particular case? I believe it's a fact issue, yes. We move for summary judgment because we think the facts are in our favor. But I do think it's a fact issue. If the judge thinks they're in dispute, a jury could say, here in Eastern Ohio, that gas is marketable at the well. Or they could say, it's not marketable at the well. And then there's the second step I keep coming back to, which is enhancement. Which makes this much different than like Hensroth and at the well lease. Which is, you could take deductions whether they benefit people or not. You just get to take them. Here, this was specifically set up to say, operator, you have to have enhancement in order to share that cost. You have to make us more money. And that's what we did. And I really, I know Mr. Barrett's going to emphasize, and the district court did, and quarter did, is saying it's oil products, gas products, and other products. And I really want to come back to this lease. In this case, it's 18 pages. It's super detailed. In paragraphs 1, 4, 10, and 26. It didn't exist in quarter. And why is that important? Because this lease gives context. It repeatedly refers to oil, gas, and other products. The MEC is not special in that way. And what's important there is, again, the lessor, the landowner, fairly wants to make sure you don't get to call it something else and not pay us a royalty. And what is historically true and true in this lease is, the separation point is right when it comes out of the ground, it is severed. The minerals are severed. And that historically is called, before that is called production cost. And after that is post-production cost. And that's really what we're focused on here, is what can be deducted. Marketability is step one. And to your question, Judge Moore, I do think it is a factual question. You have to, that's what Professor John Lowe, who I know it's not a court, but he is a oil and gas professor from SMU, in the Shugart versus Gulfport, which before this case was the only Ohio MEC case. He looked at those facts. He didn't rule as a matter of law. He took evidence and he said, were there historical sales? What's the quality? And found it was marketable at the well, but not as a matter of law. This is an arbitration. It was an arbitration under Ohio law with an MEC. It's called Shugart. And then it was entered by the district. Can I just go back to your point about, you know, the such cost language. So you've got laying out all these things, producing, gathering, storing, et cetera, which can transform. So we have that point. And then you, I think correctly, after the semicolon, however, any such costs which result in enhancing, and you're making the point that best you can tell, the only one that could apply is transporting. And doesn't that prove, you know, there's more tension between marketable and the word transform. And I guess I just want to explore whether that's right with you and the other side. I mean, I don't understand why there couldn't be storing costs. In other words, you have a purchaser that says, we don't need it now. We'll buy it in six months. So you have to store. You can imagine some processing that isn't transforming. It's just, you know, refining it still more because that's what the buyer wants. So I guess I'm not sure that this superfluous point really, it's a good point. I agree with that. I'm just not sure. Yeah, let me focus, if I could judge on what's at issue in this case, which is processing, also dehydrating and compressing, but processing is the issue in this case. Let's imagine a world. So just, the red light's on. So just go ahead. Okay, let me finish this question. But I want you to answer my, I was responding to your superfluous point. And I don't really want to hear the processing point. I want to hear, am I right? That storing could happen? Theoretically, I guess it could, Judge. Storing would typically be more at the well site. But there could be a hypothetical that no one has raised that that could be stored elsewhere. And then- Aren't there storage tanks at the second and third stage? Everything goes right to the pipeline. I would say in the industry, it wouldn't be called storage, Judge. So I would say it wouldn't be called that. All right, well, let's hear from the other side and then we'll give you full rebuttal. Thank you, Judge. Good morning. Good morning, Your Honors. May it please the Court. I'm John Barrett. And together with Dan Karen and Brian Swiger, I represent the Grissoms LLC and their 93-year-old main member, Elaine Grissom of Noble County, Ohio, as well as the 370 other lessors who signed this NTERO lease. So let's just go back to the conversation we were having with your friend on the other side and this thing of any such costs, what could they be other than transporting? Because it does support them to have this long list. The contract says any such costs. And is it really just transporting? Yeah, no, it's not, Your Honor. And here's an example. Let us assume, hypothetically, that what comes up out of the ground is of a sufficiently low BTU level so that it could be fed into a transmission pipeline and sold as natural gas right there at the wellhead. Assume that. It's not, in fact, the case because the BTU level of the gas that is extracted exceeds what is permissible to enter into the MarkWest pipeline. Also, contractually, they're obligated to... They cannot sell this gas. They are obligated to transfer it to the MarkWest facility by virtue of contracts. That's an undisputed fact in the record as well. But back to my hypothetical, if the gas were of a sufficiently low BTU level to be fed into a transmission pipeline, Antero could do that. And then it would be marketable, right? It would be marketable at that point. Sure, I think it would be marketable at that point, which, of course, is not a fact in this case, but theoretically it would be. Let's say that at that point, Antero says, well, you know what? We're getting better prices for processed NGLs. So instead of transmitting the gas directly into the pipeline, they say, we're going to send it downstream and we're going to further process it to create NGLs. I think in that scenario, which doesn't exist here, but in that scenario, Antero could recoup the cost of processing the NGLs from the royalty owner because they are indeed enhancing the value. So it's not true that our theory renders all of those costs superfluous. There are circumstances, not present in this case. And again, we're only asking the court to resolve this case and not... He makes the other point that, you know, there are other entities out there that would buy this at the wellhead. And so doesn't that prove it's marketable? No. And the reason it doesn't is because it's not a marketable oil, gas or other product, or more importantly, a plural marketable oil, gas or other product. It's not... That is what must be marketable at the wellhead according to the market enhancement clause, oil, gas or other products. And an unmixed, unprocessed stream, hydrocarbon stream is not oil, gas or other products. It's just, maybe it's oil and gas. And my friend was referring to the definition of oil and gas from section four of the lease, which includes the oil, the gas and the hydrocarbon stream. But the market enhancement clause does not use the phrase oil and gas. It uses the phrase marketable oil, gas and other products. So what must be marketable is the products plural, not the singular hydrocarbon stream. And that goes to your honor's initial question about the plural nature of marketable oil, gas and other products. It's not a single hydrocarbon stream that is the marketable product. It's the oil, gas and other products which requires processing, which undergoes processing and which in violation of the lease, Antero is charging all of these royalty owners. That's what this case is about, whether they can deduct the processing costs from the royalty payments and they cannot. What about his point that we should have a jury trial? Well, and Judge Moore's point, maybe this just let a jury decide whether this was marketable. So, you know, I think there are two probably uncontested facts and my friend will remind me or clarify me, correct me if I'm wrong. One uncontested fact is that someone somewhere might buy the hydrocarbon stream, maybe, theoretically, because there are companies that do that. It's not this case, because in this case, as I said earlier, Antero cannot sell this unmixed stream to a third party. They are required contractually to send it downstream to Mark West. But that's their choice to sign that contract. But if they are sending it in a stream to their own affiliated entity and if there is testimony, hypothetically, that other people would buy this stream, doesn't that show that it's marketable without the need for a jury? It does not, Your Honor. That goes back to what I call the plural problem. It's not... Antero is required to bear all of the costs to make not the single hydrocarbon stream marketable, but to make oil, gas, and other products marketable. That's the plural problem. Both the Fourth Circuit in the quarter case, which found in our favor, essentially on this issue, and the district court below focused on the plural problem. Their theory that what is marketable is the single hydrocarbon stream, unmixed, unprocessed, cannot stand because what must be marketable is oil, gas, and other products. And that's not what the single hydrocarbon stream is. That's the plural problem. That's why... That's the foundational problem with their argument. Your opposing counsel referenced some differences between the contract here and the one at issue in quarter. You suggested there were meaningful differences. How do you respond to that? There were no meaningful differences that I can see. It's substantially the same. There's a few wording differences, but I'm not aware. I don't believe there are any substantial, meaningful differences at all. Nor did Judge Sargas who relied upon quarter. So if you were going to point us to the specific paragraphs that you think would support your point in the lease, which ones would you point out? It's really just the sentence. It's 10C. 10C, okay. Yes. And a lot of ink spilled on that sentence. But yes, that is... And let me talk generally about how the market enhancement clause works because I think it's important. It's actually quite straightforward. There are two parts to it. The first part is that Antero has to pay all of the processing costs to transform the stream. I'm sorry to just pause on one thing. I just meant to ask and I don't want to forget it. The contract says that everybody participated in writing it, I assume as a way of avoiding the construing it against the drafter. But I'm assuming in reality, there was one lease given to all 370 and the owners, there weren't any changes after it was presented. Not to the market enhancement clause. And the court certified the class really on that basis that for all 370, the leases had the same market enhancement clause. There may have been some other differences that are unrelated to that, such as the amount of the royalty and so on. So in other words, the property owners did negotiate a little bit and did change some of the contracts. In this particular case, there were no changes to the market enhancement clause. That's all I can say. And I think that's the only real material. I'm sorry, I interrupted you. I know you were about to... I don't understand your argument about 10C, which I have studied repeatedly. So it may be my difficulties. Marketing the oil, gas and other products produced here under. So why isn't what comes out of the wellhead a product? Because it has not been processed. It's not a commodity. And that's the definitional problem that they have, okay? They have to establish that that single hydrocarbon stream singular is in fact a plural other oil, gas or other products. They can't do that. You know, they can just say it's another product, right? You're saying it's the product, not another product. Is that right? But it has to be... Then you have to also include the marketable phrase, the phrase marketable products. Yes, but if somebody else other than the affiliate would purchase from the wellhead, I don't know why products can't include product. What's produced is a product. And I'm going to be very technical here. The stuff coming out is hypothetically going into a pipeline to some other entity. And that would constitute a product. So when you talk about a product, you talk about another definition in Merriam-Webster is commodity. It's a commodity. Like in a cornfield, the commodity is not the stock of corn. The commodity is the corn. By the same token, in this case, the unprocessed stream is not the commodity. The commodity is what comes out of the other end of the processing plant. It's the ethane, the butane, the propane, and so on. Those are the marketable commodities. So it has to all be read together. I think if one just focuses on one word to the exclusion of others, it doesn't really make sense. But you have to read the whole thing together. And that's what both of these other courts did. But I do want to talk about the Shugart case. Mr. Donovan mentioned the Shugart case. That's the arbitration case. We didn't really address this very thoroughly in our brief. But Shugart also did involve a market enhancement clause. But it didn't involve anywhere near the same market enhancement clause as this case. The base lease in Shugart was an at-the-wellhead lease. It said the processing costs... What proves this is not at-the-wellhead? I mean, take Judge Moore's question. Marketable gas, oil, or other products. So one such product could be just what comes out of the wellhead if it's marketable and there are people that buy it. Why doesn't that prove this is an at-the-wellhead lease? Well, for one thing, it doesn't use that language. And if anyone knows how to use that language... The word wellhead is not the word. When you say that language, you mean the word wellhead? At-the-wellhead. Or the language that was in Your Honor's Hensroth opinion, which was an unpublished Sixth Circuit opinion, which was a little different. It's known in the industry exactly what those words mean. I thought you were going to say something different, which makes me think I don't understand the language here. I thought you were going to say the proof that it's not at-the-wellhead is the transform clause. There is that, yes. That would never be there in an at-the-wellhead lease. That's right. Transforming is not something that the parties have focused on, but you're absolutely correct, Your Honor. I mean, it needs to be transformed. There's no transforming going on with a singular hydrocarbon stream. The transforming would be just yanking it out of the ground. I mean, that is transforming in a sense. It was sitting under the ground and now it's above the ground, eligible to go into a pipe. The question that I have and cannot answer is why would Antero propose a lease that says at the very beginning of the market enhancement clause very clearly, all royalties shall be without deduction, directly or indirectly, for all of these costs, from soup to nuts, from wellhead to processing, the oil, gas or other products produced here under to transform the product into marketable form. That phrase set aside the actual terminology that's used and the definitions of those words. That phrase has all of the hallmarks of a marketable product lease and none of the hallmarks of an at-the-wellhead lease. Antero knows how to draft an at-the-wellhead lease. It did not do that. It's trying to back in now, having enticed all of these lessors to sign these agreements back in 2012 when it was developing the Seneca system. So if this is, in fact, a marketable products lease as opposed to a wellhead, what does that mean? Does that mean we should affirm the district court or does that mean we should send the case back for figuring out what are, in fact, marketable products? You should affirm the district court and there's an important point that I haven't mentioned and that is we have stipulated as to the amount of damages if we are correct. So there's no further fact finding. If we are correct, there's no further fact finding that would need to take place. The damages were set to be $10 million. That was negotiated after Judge Sargas granted our summary judgment motion. So there's no further factual development. It's a binary situation. So that stipulation is you have stipulated what, in fact, was marketable and what was not and the amount ended up being $10 million. We stipulated as to the amount of the processing costs that were improperly charged under our theory to the lessors. And to be clear, by entering into that stipulation, they weren't agreeing to our interpretation. It simply resolves all of the factual issues that this court might have to face if it does not. Okay, thank you very much. Thank you. Appreciate your argument. We'll hear rebuttal. Thank you, Your Honors. Dan Donovan. Three points. Number one, Mr. Barrett's response to you, Judge Moore, to your question, going back to the stuff that comes out of the ground, that is a factual question. He said, even if it's sold at the wellhead, that's not marketable. That was his answer. So just think about that. Even if it's sold, it wasn't marketable. Second, he talked about this BTU test. He said there might be scenarios in which that oil and gas stream that comes out, you could take deductions. That's not true under Judge Sargas' test. He said it has to be finished products. And in fact, the record in this case, the factual record, 43 of the 155 wells would meet that BTU test, yet we still lost. So I come back to the factual issue that their test to the question is processing. One month, if we sold that gas right at the wellhead, we would have no cost. But they would say that gas is marketable. That's just the way of transforming. Yeah. Are you transforming by taking a bunch of stuff below ground, pulling it up, and putting in a pipe? That's how transform... The transform is a factual question. It could be different things. But in this case, what it means is when it comes out of the ground, Judge, it's not marketable. Okay. There's still sediment in it. You need to transform. You need to take that out. You need to separate the oil and gas. No one's going to just buy it before you do that. All that is done and absorbed by Antero. That is transforming that wet gas and oil and sediment and water on the wellhead. So if it means transforming to separate sand and water, why can't it be transforming to separate natural gas from methane or whatever else there is? It might be. That's a factual question. But here, Judge, their argument is that oil and gas stream, once it's separated, that he admitted could be sold at the wellhead, he said it can never be marketable. My point is it's a factual question. Is that oil and gas that's separated, that in fact, this record shows was sold at the wellhead by other people, not my client, is that marketable? The answer is yes. Because let me give one quick example. Why shouldn't we assume that marketable was about this operation? And this operation was only going to have Mark West. It wasn't going to be eligible for the world of purchasers of Y-grade or anything else. Because that's the context of the contract. Right. But this language, Judge, is used all over the state of Ohio. It's not just Antero. So that little operator has to live with this too, where they would say it's marketable right at the wellhead. The same way, Antero set this whole thing up. So how is it different from a wellhead lease? If we agree with you, how is this different from a wellhead? Oh, it's quite different because look how explicit it is. The whole point about the well, the default rule, is if the lease is silent. This lease lays out in Tennessee exactly what can and cannot be deducted. And at the wellhead, it does not at all. You're just deducting everything. And that's a default rule, as you asked about. Well, why isn't this a marketable product lease? Yeah, because actually, a marketable product is another default rule. And it's an implied rule that is different in West Virginia, Oklahoma, and Kansas. Why isn't it in effect such a thing here? Yeah, because this one, unlike giving an implied duty created by judges, this one lays out which costs can and cannot. And so, for example, in Oklahoma, or excuse me, in Kansas, in Colorado, you actually need to get it to a market, even if it's marketable. So the problem with the marketable product argument is it's different in every state. This actually is very detailed. There's no need to imply anything. And what it talks about is oil, gas, and other products. And I come back to, my friend said, well, just look at 10C. I would submit judge under Easton, you need to look at paragraphs of 1, 4, 10, and 26, and read this as a whole. What makes sense, and what makes sense is this win-win incentive is the parties wanted to enter and move it downstream. If we can make them more money. If we can't, you don't. But that's what I come back to when you read it as a whole, marketability is a factual question. And that factual question is, where is it marketable? It doesn't always have to be the finished product, just as you said in Zentbauer. Thank you, Your Honor. We appreciate it. Thank you so much for your excellent briefs, both of you, and for terrific arguments.